PONDER, Justice.
 

 We granted a review in this case because it presented important issues that had not heretofore been passed upon by this Court.
 

 The relators are contending that the Court of Appeal erred in confusing the legality of rate classification with legality of rate; in holding that the rate classification was unlawful; and in substituting its judgment for the judgment of the administrative commission charged with that authority and responsibility.
 

 The sole issue in this case is whether or not a municipality which owns and operates its utilities, can charge a higher rate for water to customers outside the city limits who take water service only, than it charges for water to those customers outside the city who take the combined service of water and electric power. In other words is this rate classification justified where the customers are otherwise similarly situated.
 

 We have carefully considered the arguments and briefs of opposing counsel, examined the record, and analyzed the opinion handed down by the Court of Appeal in disposing of this controversy and find that no new issue has been raised in this Court and that all of the issues presented were carefully, painstakingly, ably, and correctly disposed of by the Court of Appeal, 108 So. 2d 127. Therefore no useful purpose could be gained in rehashing and reiterating the findings of the Court of Appeal consequently we adopt the opinion of the court of appeal as the opinion of this court, viz.:
 

 “Involved in this appeal is a suit for an injunction directed against the City of Monroe, as the owner, and the City of Monroe Utilities Commission, as the operator (under the provisions of Act 256 of 1956), of a municipal water plant and water, distribution system, brought by water customers of defendants who reside in an area outside of but adjacent to the city limits of Monroe.
 

 
 *855
 
 “By their suit plaintiffs, 73 in number, challenged as discriminatory and confiscatory a water rate which had been fixed by defendant Utilities Commission. They seek a declaratory judgment decreeing the illegality of the questioned rate, a preliminary injunction to restrain the enforcement of the rate complained of while the litigation is in progress, and a final judgment making the injunction permanent. To this petition defendants tendered an exception of no cause of action and subject to that exception filed an answer in which they admitted most of the allegations of fact contained in plaintiffs’ petition but denied their conclusions of law and asserted the reasonableness of the rate complained of and defendants’ right to impose it. The propriety of a declaratory judgment to resolve the controversy was not questioned.
 

 “When the rule for a preliminary injunction was called for trial, the exception of no cause of action was referred to the merits, and upon a joint stipulation of fact the case proceeded to trial on its merits and was, accordingly, tried and submitted to the court for decision, following which judgment was rendered and signed sustaining the exception of no cause of action and dismissing plaintiffs’ suit. From this judgment plaintiffs appealed.
 

 “In the consideration of the exception of no cause of action every well-pleaded allegation of fact contained in plaintiffs’ petition must be accepted as true. But, the court is not bound to accept the conclusions of the pleaders. However, plaintiffs are entitled to the benefit of such legal consequences as properly result from the well pleaded facts.
 

 “The facts alleged in their petition and upon which plaintiffs base their right to the relief they seek may be summarized- as follows:
 

 “For many years the City of Monroe has owned and operated a municipal waterworks plant and distribution system by means of which water is supplied to residents of the City of Monroe-and which has also been extended from time to time so as to serve areas outside of but adjacent to the city limits. The City has also for many years owned and operated an electric generating plant and distribution system which has also from time to time been extended beyond the city limits and by means of which electricity is supplied not only to the residents of the City but to the residents of various areas adjacent to but outside the city limits. By Act 256 of 1956 the defendant Utilities Commission was created and vested with ‘the entire management and operation of the Electric Light and Power Water Plant Systems owned by the City of Monroe’, and since the effective date of that Act this Commission has managed and operated both of these municipal utilities.
 

 “The area in which plaintiffs live is one of the areas outside the city limits in which
 
 *857
 
 electric current has been made available from the City of Monroe’s electric distribution system; and this area is also served with electric current by Louisiana Power & Light Company, so that the residents of this area enjoy two sources of electric service and are privileged to choose between these two sources which they prefer to patronize.
 

 “For some years prior to February 28, 1958, E. W. Cruse, doing business as Cruse Water System, had operated a water distribution system in the area in which plaintiffs reside, by means of which a supply of water was furnished to the residents of that particular area. The water customers of the Cruse Water System were about equally divided between the City of Monroe and Louisiana Power & Light Company in the purchase of their electric requirements, with plaintiffs being among those who procured their electric service from Louisiana Power & Light Company — at rates less than those charged by the City of Monroe for the same electric consumption.
 

 “By written contract of sale and purchase entered into under date of February 28, 1958, the City of Monroe acquired from E. W. Cruse that portion of his water distribution system which was being used by him to supply water to the area in which plaintiffs reside. This transfer was authorized, insofar as the vendor was concerned, by Special Order No. 2-58 of the Louisiana Public Service Commission, and on the part of the City of Monroe by its Ordinance No. 3245 adopted January 28, 1958, but it was consummated without solicitation from or consultation with the plaintiffs or other water customers affected thereby. No other commercial source of water supply exists in the area in which plaintiffs reside, so as a result of this acquisition by the City of Monroe these plaintiffs, without any request on their part and without their consent, became customers of the waterworks system of the City of Monroe and wholly dependent upon defendants for an adequate supply of water.
 

 “Following the City’s acquisition of the Cruse Water System the defendant Utilities Commission took over the operation of this water distribution system and immediately put into effect in this area the same water rate schedule which was applicable to all other customers of the City’s waterworks system and which was as follows:
 

 “ ‘Rate Schedule **C”—
 

 All Metered Water Service
 

 per meter
 

 Rates Quantity Rates per month
 

 First 50,000 gals, per IM gals................. $0.35
 

 Next 75,000 gals, per IM gals................. 0.30
 

 Next 75,000 gals, per IM gals................. 0.25
 

 Next 300,000 gals. per. IM gals................ 0.20
 

 All excess gals, per IM gals.................... 0.15
 

 Minimum Charge:
 

 For %" meter (or less) ........................ 2.50
 

 For 1" meters .................................... 2.75
 

 For
 
 iVz"
 
 meters ................................. 3.00
 

 For 2" meters .................................. 5.00
 

 For 3" meters .................................. 8.00
 

 For
 
 A"
 
 meters ................................... 10.00
 

 For over 4" Diameter ................. 100.00
 

 The minimum charge will entitle the consumer to the quantity of water which that monthly minimum charge will purchase at the quantity rates.’
 

 
 *859
 
 “This rate was higher than the rate schedule at which water had been’ furnished to its customers by the Cruse Water System, but plaintiffs offered no protest to the institution of this rate schedule since the rates which they were thus asked to pay were uniform with those charged other customers of defendants who were similarly situated.
 

 “However, on or about April 26, 1958 each plaintiff received either by hand delivery or through the mail an unsigned notice dated April 28, 1958 reading as follows:
 

 “ ‘Notice to Water Customers Outside the City of Monroe, Louisiana
 

 “ ‘This is to notify you that, effective with the next meter reading date which will be approximately May 7th, 1958, rates for water supplied by the City of Monroe, Louisiana through the City of Monroe Utilities Commission to nonelectric power customers serviced through meters located outside the city limits of Monroe, Louisiana, will be as follows:
 

 ‘Schedule C-l
 

 ‘First 1,000 Gallons at $7.50 per 1,000 Gallons
 

 'All excess over 1,000 Gallons at $.50 per 1,000 Gallons
 

 ‘Minimum Bill — $7.50
 

 “ ‘This rate classification and schedule is put into effect pursuant to unanimous action of the City of Monroe Utilities Commission for the reason that it is uneconomical to supply city water service beyond the geographical limits of the City of Monroe, Louisiana as an accommodation service only.
 

 ‘Monroe, Louisiana, April 28, 1958.
 

 ‘City of Monroe Utilities Commission
 

 ‘By-
 

 ‘F. L. Smith, Chairman’
 

 “A comparison of the two rate schedules discloses that for a consumption of, say 7,-000 gallons of water, plaintiffs and other water customers who were purchasing their electric requirements from Louisiana Power & Light Company would be forced under Rate Schedule C-l to pay the sum of $10.50, whereas other water customers in the area who were purchasing their electric requirements from the City of Monroe would be charged for the same amount of water used only the sum of $2.50 under Rate Schedule C. And since no commercial source of water supply was available in the area other than the waterworks system which had been taken over by defendants, the only way plaintiffs could escape payment of the increased water rate provided by Rate Schedule C-l was to purchase their electric requirements also from defendants. — at a cost greater than they were then having to pay.
 

 “Plaintiffs were thus faced with the necessity of either purchasing their electricity from defendants in order to avoid the in
 
 *861
 
 creased water rate, or paying the increased water rate as the price of exercising their right to purchase their electric requirements from the supplier of their choice.
 

 “It is this coercive feature of the matter which is under attack in this suit. Defendants having insisted upon their right to enforce the rate schedule here complained of, plaintiffs brought this action for a declaratory judgment decreeing the rate complained of to be illegal and unenforceable and for a preliminary and permanent injunction to restrain defendants from putting it into effect.
 

 “Plaintiffs assert that under the law a municipal corporation, when engaged in activities such as are here involved which are private or proprietary in nature, is governed by the rules applicable to any corporation or individual conducting a similar enterprise and that, having voluntarily purchased the Cruse Water System from the private operator thereof, defendants succeeded to the obligations as well as the rights of said former owner with respect to the continued operation of said system, including the obligation to continue to supply water to the customers of said system at reasonable, uniform and non-discriminatory rates.
 

 “Plaintiffs point out that the increased rates to which defendants would subject them amount to several times the charge which would be made for similar service to other residents of the area who purchased their electric requirements from defendants; that said increased rates are not based on considerations of quantity, time of use, manner of service, or other matters which present a substantial basis for a rate differential, but upon a pretended classification which discriminates against, plaintiffs as 'non-electric power customers’ and in favor of the customers of defendants’ electric power plant and distribution system; that there exists in the area in which plaintiffs reside no other supplier of water from which they can procure their water requirements ; that the necessary result of the enforcement of said increased rate is to coerce plaintiffs into purchasing their electric requirements from defendants in order to escape payment of an unreasonable, discriminatory and confiscatory price for their water requirements; and that as a consequence the pretended classification upon which said increased rates are predicated is arbitrary, discriminatory, unreasonable and illegal.
 

 “Plaintiffs further point out that so long as the Cruse Water System in said area was being operated by the former owner thereof, such operation was subject to the regulatory and, rate-fixing powers of the Louisiana Public Service Commission and said former operator had no right under the law, and made no attempt, to interfere with the freedom of choice enjoyed by his customers with respect to the purchase of any other public utility or to compel them to purchase other public services from -any particular
 
 *863
 
 source of supply; that although defendants are not subject to the regulatory or rate-fixing powers of the Louisiana Public Service Commission, nevertheless they have no right under the Constitution and laws of the State of Louisiana and of the United States to use the newly acquired extension to their waterworks system as an instrumentality with which to coerce plaintiffs and others similarly situated into purchasing their electric requirements from defendants at a greater cost than they are now paying therefor; and that as a consequence if defendants should be permitted to maintain and enforce the arbitrary, discriminatory and illegal rates - which they are proposing to charge, plaintiffs will thereby be deprived of their property without due process of law and be denied the equal protection of the laws in violation not only of the Constitution of the State of Louisiana, art. 1, § 2, L.S.A., but of the Fourteenth Amendment to the Constitution of the United States.
 

 “In his reasons for judgment the learned ■ judge of the trial court, after recounting the allegations -of plaintiffs’ petition, outlined '-•the issue to be decided as follows:
 

 “ ‘The primary issue in this case is whether or not the rate classification, applicable to customers outside the city limits who purchase water only from the City and who do not purchase electricity from the City, is a lawful classification.’,
 

 and concluded r
 

 “ ‘Plaintiffs’ counsel argue that the effect of the classification by the Utilities Commission of the City of Monroe will be to coerce the plaintiffs into purchasing their electrical current from the City of Monroe, but the Court is of the opinion that this is not true. Even though there is no other commercial source of water in the area covered by this lawsuit, the plaintiffs could refuse to purchase water from the Utilities Commission of the City of Monroe and obtain their water from wells, which some of the people who live in this area do. Inasmuch as the plaintiffs in this case can purchase electricity from the Louisiana Power and Light Company or the Utilities Commission of the City of Monroe, and may or may not purchase their water supply from the Utilities Commission as they choose, the Court is of the opinion that the classification in this case is not unlawfully discriminatory.
 

 “ ‘Therefore the exception of no cause of action is sustained and the injunction is denied.’
 

 “Although his ultimate rejection of plaintiffs’ demands was thus predicated upon a sustaining of defendants’ exception of no cause of action, it seems obvious from a reading of his opinion in its entirety that his conclusions were based, in part, at least, upon a consideration of the joint stipulation
 
 *865
 
 of fact on which the case was tried on its merits.
 

 “In considering and determining the right of the defendants to enforce the water rate here complained of, it must be borne in mind that a municipal corporation has two classes of powers, one public and the other private in character. This was pointed out by our Supreme Court in the case of Hall v. City of Shreveport, 1925, 157 La. 589, 591-594, 102 So. 680, 681, in the following language:
 

 “ ‘It is well settled that the powers and obligations of municipal corporations are twofold in character: Those that are of a public nature, and those that are of a private nature. As to the first, or public character of its powers and obligations, the municipal corporation represents the state, discharging duties incumbent upon the state. As to the second, or private character of its powers and obligations, the municipal corporation represents the pecuniary and proprietary interests of individuals. In its public character, as the agent of the state, it becomes the representative of sovereignty, and is not answerable for the nonfeasance or malfeasance of its public agents. In its private or proprietary functions it is held to the same responsibility as is a private corporation. Stewart v. City of New Orleans, 9 La.Ann. 461, 61 Am.Dec. 218; Bennett v. City of New Orleans, 14 La.Ann. 120; City of New Orleans v. Kerr, 50 La.Ann. 413, 23 So. 384, 69 Am.St.Rep. 442; Davis v. New Orleans Public Belt R. R., 155 La. 504, 99 So. 419, 31 A.L.R. 1303; Solomon v. City of New Orleans, 156 La. 629, 101 So. 1.’ (Emphasis supplied.)
 

 “Moreover, the City of Monroe in the operation of its public utilities is in precisely the same position as a private corporation, as was also squarely held by our Supreme Court in the case of Vicksburg, S. & P. Railway Co. v. City of Monroe, 1927, 164 La. 1033, 1039-1040, 115 So. 136, 138, in this language:
 

 “ ‘It is clear, therefore, that the operation by the city of Monroe of a street railway is a private undertaking for private gain, and that the position of defendant municipality in the case at bar is the same as that of a private corporation engaged in the same business.
 

 “ ‘While, in the matters affecting the public welfare, the city of Monroe may pass all reasonable ordinances as to the regulation of railroads within its jurisdiction, under the statutes relied upon in this case, yet, quoad its private enterprise, or street railway, defendant municipality does not enjoy the status of a governmental agency, but is governed by the rules applicable to a private corporation.’ (Emphasis supplied.)
 

 
 *867
 
 “With respect to water customers of the Cruse Water System, the City of Monroe and its Utilities Commission, by acquiring the water system which had been serving the area in which plaintiffs reside, not only acquired the rights -and assets of the previous owner thereof but succceeded to his obligations. This legal result is recognized by a majority of the authorities. For instance, in 67 C.J. 1158, verbo ‘Waters’, Section 633, it is stated:
 

 “ ‘Where it (a municipal corporation) engages in the business of selling water for a profit, it is governed by the same rules as control an individual or business corporation under like circumstances, and is subject to the same liabilities. So, in general, a municipal corporation which purchases the assets and franchise of a water company acquires the rights and privileges of, and has no greater rights and powers than, such company; it assumes the responsibilities of, and is subject to the same obligations as, such company.’ See also 94 C.J.S. Waters § 241.
 

 “Likewise, in McQuillin on Municipal Corporations, Vol. IV, Section 1801, page 3862, it is stated:
 

 “ ‘Where the municipality purchases the plant of a private company, it acts thereafter in a proprietary capacity in carrying on the obligations of the quasi public company, and is under the obligation and possesses the rights of such company, and it seems that it becomes bound to supply persons outside the city limits where the private company was burdened with such duty.’
 

 “In 38 Am.Jur. 259-260, verbo ‘Municipal Corporation,’ Section 570, the rule is set forth as follows:
 

 “ ‘A municipal corporation empowered to purchase an existing public utility plant serving territory within and without ' the corporate limits should, it has been held, step into the shoes of the public utility and continue to furnish service not merely to inhabitants within the corporate limits, but to people outside the corporation formerly served by the utility. In the absence of express constitutional or legislative regulations,' it is generally held that a municipal corporation in conducting extraterritorial activities such as public utilities is subject to the condition in force within the outside territory in which it acts.’
 

 “Also see Durant v. City of Beverly Hills, 1940, 39 Cal.App.2d 133, 102 P.2d 759, and North Little Rock Water Co. v. Water Works Commission of City of Little Rock, 1940, 199 Ark. 773, 136 S.W.2d 194.
 

 “The trial judge, after reviewing these authorities, conceded the correctness of this legal principle, but held the principle inapplicable to the case at bar by pointing out:
 

 
 *869
 
 “ ‘The Court concedes this principle of law to be correct. However, the rights and privileges with its attending responsibilities and obligations acquired by the municipality, is the responsibility of carrying on the service as had been carried on by the former owner. In the quotations by plaintiffs’ counsel, nowhere is it said that the municipality acquiring the assets and franchises of a water company is to continue to keep in force the rates or the classification of rates made by its former owner.’
 

 “However, it is not here contended that these defendants, after having acquired the assets and franchises of the Cruse, Water System, were obligated to keep in force either the rates or the classification of rates which were in effect under the prior ownership. But the contention is that following their acquisition of the water distribution system which had been serving the area in which these plaintiffs reside, these defendants’ rights and obligations with respect to the operation of that water system and to the water customers whom they took over must be tested by the same rules that are applicable to a private utility corporation,
 
 and
 
 this fact was recognized by the trial Judge who, following the excerpt from his reasons for judgment as just above quoted, immediately added:
 

 “ ‘It is true that the obligations of a private utility corporation is to serve its customers at reasonable and nondiscriminatory rates and the question involved here is whether the rates are discriminatory.’
 

 “That one of the principal obligations of a private utility corporation is to serve its customers at reasonable and nondiscriminatory rates is a point on which all of the authorities are apparently in accord. For instance, in 73 C.J.S. Public Utilities § 27, p. 1048, the rule is stated thus:
 

 “ ‘A' utility may charge but one rate for a particular service, and any discrimination between customers as to> the rate charged for the same service under like circumstances is improper; but a utility may, without being guilty of unlawful discrimination, classify its customers on any reasonable basis and make separate rates for each class.
 

 “ ‘The fundamental theory of rate making for public utilities is that there shall be but one rate for a particular service, and a charge made to one patron or consumer different from that made to another, for the same service, under discrimination and renders the charge improper and a violation of a statutory provision against discrimination or preferences.’
 

 “However, it is also true- that this obligation is equally applicable to municipal utilities. For example, in McQuillin on
 
 *871
 
 Municipal Corporation, Vol. IV, Section 1725, page 3690, it is pointed out:
 

 “ ‘Independent of statute, contract, or municipal regulation, the rates fixed by a public service company, or a municipality owning its own plant, must be reasonable; and a municipality which owns its own plant cannot impose arbitrary charges under penalty of forfeiture of the right to use the supply.’,
 

 and in an annotation appearing in 50 A.L.R. 126, dealing with ‘Discrimination in the Operation of a Municipal Utility’, the fact that this rule generally prevails and is fully applicable to municipalities is thus set forth:
 

 “ ‘The general rule is well established that when a municipality undertakes to furnish a public service, such as the supplying of electricity, gas, or water, to consumers other than itself, it acts in its proprietary, and not in its governmental, capacity, and cannot grant free or reduced rates or otherwise make discriminations which would be unlawful if the service were rendered by an individual or private corporation ; in other words, the fact that the service is by a municipal plant does not change the rule prohibiting unreasonable discrimination.’
 

 “It is thus clear that these defendants’ obligations to maintain uniform and nondiscriminatory rates among the customers of the Cruse Water System arise not only because of the application of that principle to a municipal utility but also because of the assumption by these defendants of the corresponding which the law imposed upon the previous private operator. This principle was clearly recognized by the Supreme Court of our neighboring state of Texas in the case of City of Texarkana v. Wiggins, 1952, 151 Tex. 100, 246 S.W.2d 622, 624-625, where that court said:
 

 “ ‘The common-law rule that one engaged in rendering a service affected with a public interest or, more strictly, what has come to be known as a utility service, may not discriminate in charges or service as between persons similarly situated is of such long standing and is so well recognized that it needs no citation of authority to support it.
 

 ífc 5}í
 
 jfi
 
 >¡C Jfc
 

 “ ‘It is settled' in this state that the petitioner, upon the purchase by it of the property of the privately-owned utility, was subject to this same rule prohibiting unreasonable or unjustified discrimination in rates arid service. City of Galveston v. Kenner, 1922, 111 Tex. 484, 240 S.W. 894; City of Houston v. Lockwood Investment Co., Tex. Civ.App.1912, 144 S.W. 685, writ dismissed; Town of Highland Park v. Guthrie, Tex.Civ.App.1925, 269 S.W.
 
 *873
 
 193, writ refused. This same rule prevails in many other states. 43 Am. Juris. 684, Sec. 172; 50 A.L.R. 126.’
 

 “Whether the rate here under attack is discriminatory against these plaintiffs, no decision in Louisiana has been found which is directly in point. However, in considering that question certain broad principles of public utility operation must be kept in mind. Thus, the restrictions against discrimination to which a public utility is subject do not adversely affect the right of the operator of a public utility to make a reasonable classification of its customers based upon material differences in the type and quantity of service furnished and to charge a different rate as between such classes. This right is clearly stated in the case of Caldwell v. City of Abilene, Tex.Civ.App.1953, 260 S.W.2d 712, 714, in the following language:
 

 “ ‘It is well established that a municipal corporation operating its water works or other public utility has the right to classify consumers under reasonable classification based upon such factors as the cost of service, the purpose for which the service or product is received, the quantity or amount received, the different character of the service furnished, the time of its use or any other matter which presents a substantial difference as a ground of distinction. 73 C.J.S. Public Utilities § 27, p. 1049; 43 Am.Jur. 689; American Aniline Products, Inc., v. City of Lock Haven, 288 Pa. 420, 135 A. 726, 50 A.L.R. 121.’
 

 and again in the case of American Aniline Products, Inc., v. City of Lock Haven, 1927, 288 Pa. 420, 135 A. 726, 727, 50 A.L.R. 121, 124-125, as follows:
 

 “But a city has a wide range of discretion in classifying the service, but the classification must be a reasonable one, based on consideration as to quantity, time of use, or manner of service, or other matters which present a substantial difference as ground for distinction. A classification based on a particular business or use for a special purpose will not, without more, justify classification or discriminatory rates. We do not intimate, in Barnes Laundry Co. v. City of Pittsburgh, supra [266 Pa. 24, 109 A. 535], that a classification can be made whereby one of the classes receives water free of cost. On the contrary, we state that a ‘city operating a legalized monopoly, in the nature of a water plant, cannot give undue or unreasonable preference or advantage to, or make unfair discrimination among, customers, any more than a private corporation similarly situated’; to give water away to a manufacturing plant is a discrimination.”
 

 But, it is also true, as pointed out in these citations, that the classification resorted to
 
 *875
 
 must be a reasonable one or, as stated in 73 C.J.S. Public Utilities § 27, pp. 1049, 1050:
 

 “‘It is only unjust or unreasonable discrimination which renders a rate or charge unreasonable; and a utility may, without being guilty of unlawful discrimination, classify its customers or patrons on any reasonable basis, as according to the purpose for which they receive its service or product or the quantity or amount received, or the different character of the service furnished, and, subject to the general requirements of reasonableness, discussed supra § 25, make separate rates for each class or group, even
 
 though
 
 there is but one customer included therein.
 

 * * (emphasis supplied)
 

 or again in the case of Almaras v. City of Hattiesburg, 1938, 181 Miss. 752, 180 So. 392, 394, as follows:
 

 “ ‘While the city is permitted, within reasonable limits, to classify rates in a practical business manner, determined by practical standards for securing* practical justice, it must use reasonable classifications, having proper relation to the Code requirements as a whole.’
 

 “There is no disagreement with the principles of rate classification set out in the case of Durant v. City of Beverly Hills, 1940, 39 Cal.App.2d 133, 102 P.2d 759, for it is recognized that the mere fact that various classes of users may be charged different rates is not alone sufficient to constitute unjust discrimination.
 

 “Plaintiffs here are not contesting the right of these defendants to charge to all of their water customers who reside outside of the corporate limits of Monroe a rate for water which is higher than that charged to water customers residing within the corporate limits, but a rate discrimination is objectionable which draws an unfair line or strikes an unfair balance between those in like circumstances having equal rights and privileges. The contention here is that the rate classification which' defendants are seeking to impose strikes an unfair balance between defendants’ water customers who are also users of defendants’ electric service as compared with other water customers in like circumstances having equal rights and' privileges who happen to be non-users of that service; that the use or non-use by defendant’s non-resident water customers of the electric service which is also available from defendants does not constitute a reasonable and sustainable basis, of classification for a differential in rates; and that such a classification and the rate based thereon are unreasonably discriminatory.
 

 “That the rate here complained of is discriminatory in fact cannot be denied. We have already pointed out that for a water consumption of 7,000 gallons per month the rate here complained of will
 
 *877
 
 require plaintiffs to pay a monthly charge of $10.50, whereas for the same amount of water consumed, their neighbors, who happen also to be users of defendants’ electricity, will be required to pay a monthly charge of only $2.50. It is completely unrealistic and inaccurate to argue that a rate which requires one individual to pay $10.50 for a service which is rendered to his neighbor for the sum of $2.50, is not discrimination of the grossest sort. And we do not understand that defendants are contending to the contrary.
 

 “What defendants are contending is that such discrimination is legally maintainable, or, in other words, that the classification which they have adopted for the rate differential here at issue is, under the law, a reasonable one. While our search fails to reveal a Louisiana decision which passes squarely on the point here at issue, the law is well settled in other jurisdictions that a public utility corporation has no right to refuse its service because of collateral matter not related to that service. This rule is set out in 43 Am.Jur. 588, verbo 'Corporate Utilities and Services’, Section 23, in the following language:
 

 “ ‘The decisions are generally in accord in holding that a public utility corporation cannot refuse to render the service which it is authorized by its charter to furnish, because of some collateral matter not related to that service.’,
 

 and is supported by citations from various jurisdictions in an annotation appearing at 55 A.L.R. 771. That annotation, which discusses the ‘Right of public utility corporation to refuse its service because of collateral matter not related to that service’ follows the reported case of Ten Broek v. Miller, 1927, 240 Mich. 667, 216 N.W. 385, 386, 55 A.L.R. 768, in which it was held that the proprietor of a summer resort, who sells cottage lots and undertakes as a public utility to supply owners with water and light, cannot refuse to furnish water and light to a lot owner because of his refusal to comply with a rule requiring such owners to provide septic tanks for the disposal of sewage. In so holding the Court there pointed out:
 

 “ ‘The resort company was engaged in serving the public with water and light. This was a public service, and it was its duty to serve all patrons alike, and not to discriminate against any one of them, and this rule would apply, even though defendant were only a semi-public utility corporation. * * * It had a right to provide reasonable rules and regulations in the conduct of its business, of furnishing water and electric light, and, unless these rules and regulations were complied with, it would have a right to decline service.
 

 It was, however, the duty of the resort company to furnish water and light under reasonable rules and regulations.
 
 *879
 
 * * * The plaintiff denies that the resort company had any rule or regulation that septic tanks should be installed, and no such rule is shown in the evidence. But, even if it did have such a rule, and it was not complied with by plaintiff, that would furnish no adequate reason for refusing to furnish him water and light.’
 

 “The annotation in 55 A.L.R. 771 (55 A.L.R. pp. 770-771, 772) notes the application of this rule in Montana, as follows r
 

 “ ‘In State ex rel. Deeney v. Butte Electric & Power Co., 1911, 43 Mont. 118, 115 P. 44, it appeared that a company which was authorized by its franchise to furnish electricity to the general public had also been supplying gas for fuel purposes, apparently without a franchise. The company refused to furnish electricity to one of its patrons any longer unless he would agree to pay for gas which it was alleged he had stolen from the company. It was held that the company had no right to impose a condition the purpose of which was to use its franchise to protect its private gas business, and that it could not refuse to furnish electricity until the gas was paid for.’,
 

 and in Illinois:
 

 “ ‘In Snell v. Clinton Electric Light, Heat & P(ower) Co., 1902, 196 Ill. 626, 63 N.E. 1082, 58 L.R.A. 284, 89 Am.St.Rep. 341, it appeared that a company which furnished electric power for lighting purposes had refused to extend its service to the owner of a house who had had his house wired by. another person unless the owner would pay for the transformer which was usually furnished by the company free of charge to those who had their premises wired by the company. It was held that the electric company could not legally impose such a condition, since the business of wiring premises for the purpose of using electric power was separate and- distinct from that of furnishing electricity for lighting purposes.’, (emphasis supplied)
 

 and calls attention to a Colorado case, the ruling in which is particularly applicable here, and states:
 

 “ ‘In Seaton Mountain Electric Light, Heat & P(ower) Co. v. Idaho Springs Invest(ment) Co., 49 Colo. 122, 111 P. 834, 33 L.R.A.,N.S., 1078 it appeared that a corporation had obtained a franchise whereby it was authorized to furnish electric current for lighting purposes and steam or water heat. It sought to impose a condition by which it would refuse to furnish steam heat to persons who did not also use its electric light power, on the ground that the steam-heat service was merely a byproduct of the electric light plant, and that it could not furnish the former
 
 *881
 
 without the latter unless it sustained a loss. The court, in holding that a condition of this kind was arbitrary and unreasonable, said: “While it is true that the Seaton Company is engaged in manufacturing and selling electric current, and utilizes the exhaust steam from the plant used in manufacturing the electric current for the purpose of furnishing heat, the business of the Seaton Company, so far as these two products are concerned, is separate and distinct. It did not secure a franchise from the city merely to furnish heat from a by-product or exhaust steam, but obtained the right to place and maintain underground lines of pipe under and through the streets” for the purpose of conducting, transmitting, and distributing heat, either hot water or steam, for the purchase and use by said city and the residents and citizens thereof.’ It cannot excuse its proposed action on the ground that furnishing steam alone will entail a loss which can be avoided, if electric current is also taken by the consumer for lighting purposes; neither will it be permitted to impose the condition that a consumer must purchase both of its products in order that its profits may be increased or loss prevented.’ (Emphasis supplied.)
 

 “The Court below recognized that in this line of cases the courts correctly hold that ‘public utility corporations cannot refuse to render the service which it is authorized by its charter to furnish because of some collateral matter not related to that service,’ but expressed the opinion ‘that the holdings in this line of cases are not applicable to the case now before the Court for the reason that the Monroe Utilities Commission does not state that they will refuse to furnish water if their customers do not purchase electricity, but it fixes a rate for all non-electric power customers serviced through meters located outside the City of Monroe.’
 

 “That there is no difference between the refusal to render service and the fixing of a discriminatory rate is recognized by the authorities. For example, the Seaton Mountain case above referred to is also cited and discussed in Pond on Public Utilities, Fourth Edition, Vol. 1, page 496, Section 278, and that author on the authority of the holding in that case points out:
 

 “ ‘Each kind of service must be furnished on its own merits and no discrimination is permitted against a customer for one service because he does not desire another service. This is clearly established by the case of Sea-ton Mountain Electric Light, Heat & P(ower) Co. v. Idaho Springs, Investment) Co., 49 Colo. 122, 111 P. 834, 33 L.R.A.,N.S., 1080 * *
 

 (Emphasis supplied.)
 

 
 *883
 
 And this author, after quoting excerpts from the Seaton Mountain case, continues:
 

 “ ‘This principle is tersely stated in the case of North Carolina Public Service Co. v. Southern Power Co. (4 Cir.,) 282 F. 837, 33 A.L.R. 626, P.U.R.1923A, 289, as follows: “But, when a corporation has definitely undertaken and entered upon a particular service authorized by a charter which confers the right of eminent domain, the obligation to perform the service is complete, its rates and terms are subject to regulation by public authority, and it must serve all alike. In such public service it cannot pick and choose its customers.” ’ (Emphasis supplied.)
 

 “A reference to the Southern Power Company case, referred to by Professor Pond, shows that in that case the defendant power company had ‘Made contracts with the Southern Public Utilities Company’ (a competitor of the plaintiff), (282 F. 842) ‘to furnish it current at a rate materially lower than that demanded of the North Carolina Public Service Company,’ and the Southern Power Company claimed the right to charge the plaintiff a discriminatory rate because plaintiff was purchasing power for resale. And the Court rejected this consideration as a valid basis for the rate differential which the utility company was seeking to' impose.
 

 “It is axiomatic that the unrestrained power to tax constitutes the power to destroy, and it is quite as axiomatic that the unregulated power to fix a rate for a utility service, based upon some collateral matter not related to that service, constitutes the power to refuse the service, constitutes the power -to refuse the service itself.
 

 “The Court below, after citing from the Seaton Mountain case the following excerpt :
 

 “ ‘Plaintiffs are required to take electric current for lighting purposes as a condition precedent to being furnished with steam for heat. This is simply coercion, and an attempt on the part of the defendant to compel the plaintiffs to purchase electric current which they may want or need * * * It is their privilege to determine whether they desire one or both of the commodities in which the Seaton Company manufactures and sells, and a condition which imposes an obligation to take both or neither is not only unreasonable, but capricious, arbitrary, oppressive, and discriminatory.’ (49 Colo. 122, 111 P. 835),
 

 and after pointing out that in the case at bar defendants were merely increasing their water rate to these plaintiffs and not refusing to furnish them water, .concluded that:
 

 “ ‘* * * There is no coercion by the City of Monroe to force its water
 
 *885
 
 customers outside the City limits to purchase electricity/
 

 “In this conclusion we disagree. We cannot see how it can be seriously contended that no . coercion is here involved. For, as we have already pointed out, under the fate which plaintiffs are here protesting, the cost of 7,000 gallons of water per month to the customer who uses both city water and city electricity is the sum of $2.50, whereas to his neighbor who uses water service only, the cost of this same 7,000 gallons of water per month is $10.50.
 

 “Applying the principles of the Sea-ton Mountain decision to the case at bar, the business of these defendants, insofar as the supplying of water service is concerned, is completely separate and distinct from their business of supplying electric current. It is the privilege of defendants' customers to determine whether they desire to take one or both of the commodities which defendants manufacture and sell, and a condition, which penalizes the failure to take both, in effect imposes an obligation to take both or neither and, as a consequence, is not only unreasonable but capricious, arbitrary, oppressive and discriminatory.
 

 “In his work of Public Utilities (4th Ed., Vol. 1, page 602, Section 280) Pond also •recognizes that this rule is equally applicable to municipalities, as follows:
 

 “ ‘Discrimination in rates or service is not permitted by municipalities any more than private public utilities, and the requirements that a substantial sum be paid by a certain section of the municipality for the privilege of receiving service, which is not required of other customers or sections, violates the rule against discrimination, and is not permissible under the decision in the case of Western Reserve Steel Co. v. (Village of) Cuyahoga Heights, 118 Ohio St. 544, 161 N.E. 920, where the court said: “But when a municipality, under the authority conferred upon it by the constitution, engages in the operation of a public utility, it enters that field burdened with the same duties and subject to the same restrictions, in respect to the public of the territory served, as would apply to and govern a private corporation similarly engaged; and especially where it engages in such enterprise extra territorium in its relationship to the public shorn of sovereign prerogative. * * * The duty of the city of Cleveland to the public of the village of Cuyahoga Heights with reference to supplying it with water was the duty of a public service corporation dedicated to the service of such public. The duty of the village of Cuyahoga Heights to its own public was the duty of a government contracting for a public service, and, as such,
 
 *887
 
 to do so without discrimination in favor of or against any member of its public; and neither the city nor the village had the power, by contract with the other, to absolve itself from its duty. * * * That it is a discrimination against the plaintiffs in error to require of them the payment to the village of $4,546.80 for the privilege of thereafter buying water from the city, which payment is not required of any other member of its public, proclaims itself by the mere statement * * * The exaction by the village that the city refrain from serving water to the plaintiffs in error until they have paid an indebtedness contracted by the Hunter Crucible Steel Company is an unreasonable and unlawful discrimination against them, and the insertion of such provision in the contract was a violation of the duty of the village to its public and was unlawful. Its enforcement against the plaintiffs in error is an unlawful discrimination against them.” ’,
 

 which application has been also recognized by the Texas Court of Civil Appeals in the case of Nueces County Water Improvement Dist. No. 1 v. Spring, 1942, 139 Tex. 297, 162 S.W.2d 155, 156, as follows:
 

 “ ‘Appellee admittedly desires to use his property for the purpose of maintaining a dog and cat hospital. Such use is neither illegal or violative of any rule of public policy. ■ This being true, appellant, was not justified in its refusal to deliver water to appellee. It is well settled that “a public utility corporation can not refuse to render the service which it is authorized by its charter (or by law) to furnish, because of some collateral matter not related to that service.”
 

 Annotations 55 A.L.R. 771; Allen v. Park Place Water, Light & Power Co., Tex.Civ. App., 266 S.W. 219; Ten Broek v. Miller, 240 Mich. 667, 216 N.W. 385, 55 A.L.R. 768.’
 

 “Applying these authorities to the case at bar, it is, of course, obvious that the rate here complained of cannot be sustained, for it undertakes to establish a basis for rate classification which is entirely collateral to and unconnected with the particular service which is being rendered. Defendants have no more right to condition their charge for water service upon the purchase vel non of their electric service, than they would have to exact from their water customers patronage of the City’s municipal bus -line or, for that matter, the purchase of their groceries from a particular grocery store. None of these matters has any relationship whatever to the furnishing of water service and a regulation of rate classification which has such a basis is obviously discriminatory and illegal.
 

 “It will not do to say that plaintiffs are free either to purchase defendants’ water
 
 *889
 
 or to refuse to do so because, of course, that is the privilege of all customers of a public utility irrespective of the rate sought to be charged. This argument overlooks the fact that defendants are engaged in the operation of a municipal utility and are under the legal obligation to carry out the obligations of the former owner of this waterworks system and continue supplying water service to his customers at reasonable and non-discriminatory rates.
 

 “Although defendants are not subject to the regulatory powers of the Louisiana Public Service Commission, that fact does not exempt them from the obligation to base any classification for rate purposes upon factors reasonably related to the service for which the rate is being imposed, nor permit them to base their classification for rate purposes upon collateral matters not related to that service.
 

 “The only material distinction between the Seaton Mountain case and the case at bar is that in the cited case the utility company there undertook to refuse to supply steam unless the customer would also agree to purchase electricity, whereas here these defendants do not refuse to supply water service to those customers who do not wish to purchase defendant’s electricity, but simply charge four times as much for the same amount of water.
 

 “Defendants in their brief and argument to the Court below cited the case of City of Moultrie v. Burgess, 1955, 212 Ga. 22, 90 S.E.2d 1, as sustaining their right to charge one rate to those of its non-resident customers who purchase water only and another and lower rate to those who purchase both water and electricity. However, that holding was predicated squarely on the proposition that under the jurisprudence of the Georgia Supreme Court a municipality is under no legal obligation whatsoever with respect to non-resident customers of its municipal utility. This was pointed out by the Court in the following language:
 

 “ ‘A municipal corporation does not become in any sense a public utility by reason of the fact that it is empowered to operate, and does operate, an electric light and water plant.’ Georgia Public Service Commission v. City of Albany, 180 Ga. 355, 179 S.E. 369. And this is so where the municipality has legislative authority to operate such plants both within and without its corporate limits and to fix the rates to be charged for such service. (90 S.E.2d 2.)
 

 jjí
 
 ^
 
 ‡ ‡ ‡ ‡ #
 

 “ ‘In this case and respecting those customers who reside outside of its corporate limits, the defendant city has fixed one rate to those who purchase water only, and another and lower rate for water to those who purchase both
 
 *891
 
 water and electricity from it. * * * The plaintiffs, having no right to demand water service from the city, may purchase it at the city’s charge therefor, or they may decline to do so, at their will, but they are in no position which authorizes them to complain of an excessive charge or a discriminatory rate. Hence, there is no merit in the contention that the city’s ordinances which fix different water rates for those who reside outside of its corporate limits offend the Fourteenth Amendment to the Federal Constitution or the equal protection clause of Georgia’s Constitution of 1945.’ 90 S.E.2d at pages 3-4. (Emphasis supplied.)
 

 “The conclusions reached by the Supreme Court of Georgia were based upon legal concepts announced in the South Carolina case of Childs v. City of Columbia, 1911, 87 S.C. 566, 70 S.E. 296, 297, 34 L.R.A., N.S., 542, in the following manner:
 

 “ ‘Evidently the complaint is framed on the theory that the city of Columbia is to be considered, with respect to the contract alleged, as if it were a private business corporation, bound by any contract made by the city authorities to furnish water beyond the city limits. Counsel for appellant has submitted an elaborate argument supported by many authorities in support of that theory. Assuming the correctness of this position, it does not by any means follow that the city occupied towards the plaintiff, a nonresident, the relation of a public, service corporation, under obligation to contract with him for his water supply at a reasonable rate without discrimination.
 

 ífí ífc
 

 “ ‘It follows that the plaintiff as a mere nonresident had no rights whatever against the city, except such as he may have acquired by contract. In other words, the city was under no public duty to furnish water to the plaintiff at reasonable rates or to furnish it at all, and to obtain the injunction the plaintiff must show that the city is about to violate its contract with him.’
 

 ‘¡These concepts do not prevail in Louisiana. In this state a municipal corporation, when engaged in the operation of a public utility, is subject'to the same rules that are applicable to a private corporation. See Vicksburg, S. & P. Railway Co. v. City of Monroe, 1927, 164 La. 1033, 115 So. 136, supra. And in the case of Johnson v. [Mayor and City Commission of] City of Natchitoches, 2d Cir., 1930, 14 La.App. 40, 129 So. 433, 436, this Court recognized that the rates established by a municipal corporation for its utility service were subject to judicial review in the following language:
 

 “ ‘Under the general municipal laws of this state, which apply to the city of Natchitoches, municipalities may
 
 *893
 
 own and operate public utilities, such as water and light plants, and are authorized “to fix the rates for the consumption of the service so furnished.” It will be conceded, of course, that the rates for such services must be equal, uniform, and not discriminatory. They must apply to all classes, businesses, and individuals alike, and in order that they may so apply, and in order that consumers may know what rate is demanded, these rates must be officially fixed by ordinance and the proper record made and kept of them. Otherwise, one consumer might be charged one rate, and another consumer an entirely different rate.’
 

 “The exception of no cause of action here involved cannot be sustained. The right of the Courts to review the rates charged by a municipality is recognized in most jurisdictions, typical of which is a holding of the Supreme Court of Arkansas in the case of Delony v. Rucker, 1957, 227 Ark. 869, 302 S.W.2d 287, 289, as follows:
 

 “ ‘In holding that the ordinance before us is ostensibly, valid we do not imply that there is no limit to the rates that a city may impose upon its nonresident patrons. Although that view prevails in South Carolina, Childs v. City of Columbia, supra, as a general rule it is held that the municipality’s charges must be “fair, reasonable, and just, uniform and nondiscriminatory.” McQuillin, loc. cit.; cf. City of Altoona v. Pennsylvania Public Utility Commission, 168 Pa.Super. 246, 77 A.2d 740. Act 321 recognizes the traditional view, for it provides: “What may be supplied to non-resident 'consumers at such rates as the Legislative Body of the municipality may deem just and reasonable * * Needless to say, the reasonableness of the rates fixed by the city council is a matter open to judicial review. North Little Rock v. Rose, 136 Ark. 298, 206 S.W. 449; Camden Gas Corp. v. City of Camden, 184 Ark. 34, 41 S.W.2d 979.’ (emphasis supplied),
 

 and the holding of the Supreme Court of Texas in the case of City of Texarkana v. Wiggins, 1952, 151 Tex. 100, 246 S.W.2d 622, 624, 625, as follows:
 

 “ ‘Respondents contend that the city in operating its water and sewer systems is acting in its proprietary capacity, that it is subject to the same rules and regulations as privately owned utility corporations engaged in the same or similar businesses, and that the rates established by the ordinance of August 8, 1950, being discriminatory, are void and their collection should be enjoined. ■
 

 * * *„ * * *
 

 “ ‘The change from private to public ownership may, in theory at least.
 
 *895
 
 eliminate or lessen the profit motive, but the consumer of utility services still cannot pick and choose his supplier of water as he does his grocer. The utility consumer is thus at the mercy of the monopóly and, for this reason, utilities, regardless of the character of their ownership, should be and have been, subjected to control under the common law rule forbidding unreasonable discrimination.
 

 “ ‘We do not pass upon the question whether the petitioner is under a legal duty to serve respondents with water and sewage disposal, nor do we pass on the question whether the rates charged by petitioner, whether within or without its corporate limits, are required to be “reasonable” as that term is understood in public utility parlance (i. e., a “reasonable” rate yields “a fair return on fair value”). But assuming that petitioner has no duty to serve, it does not follow, under the common law rule at least, that having elected to serve it may do so on such terms as it chooses to impose. * * *’
 

 “Moreover, we are reminded that the observation attributed to the late Justice Holmes of the United States Supreme Court on the axiom 'that the power to tax is the power to destroy’ when he said, ‘Not, while this court sits,’ is appropriate here and is clearly indicative of the authority of the courts to review allegedly unreasonable, arbitrary, confiscatory and discriminatory classifications and rates for utility services, particularly those services not subject to the .regulatory authority of the Public Service Commission.
 

 “The opinion of this court is that the allegations of plaintiffs’ petition present a situation which not only permits but demands review by the Court and, as a consequence, that the exception of no cause oj action must be overruled.
 

 “As to the merits, reference to the answer filed by defendants and to the stipulation of fact upon which the case was tried will show that all of the salient facts included in plaintiffs’ petition, as hereinabove outlined, have been admitted; and these facts have been supplemented by the actual incorporation into the record of the act of sale and transfer from E. W. Cruse to the City of Monroe and with copies of the electric rate schedules of Louisiana Power & Light Company and the City of Monroe applicable in the area in which plaintiffs reside.
 

 “The same authorities which have been cited above to sustain plaintiffs’ right to maintain the cause of action here asserted also amply sustain plaintiffs’ right to have the rate here complained of annulled 'and set aside as being discriminatory, confiscatory and illegal. Plaintiffs are also entitled to invoke the injunctive processes of the courts to restrain its enforcement.
 

 
 *897
 
 “It is not necessary to a decision of this litigation for us to consider and discuss defendants’ right to charge to its water customers rates which are reasonable and based on reasonable classifications, or even to question defendants’ right to charge to all of its non-resident water customers a' higher rate than is charged to those living within the city limits, but as the rate here complained of is illegal and discriminatory, plaintiffs are entitled both to a judgment decreeing that illegality and to the injunction which they are seeking. This determination finds ample support in the record from which it could but be concluded:
 

 “(1) That in the operation of their municipal utilities defendants are acting in a proprietary rather than a governmental capacity and are subject to the restrictions applicable to private utility corporations;
 

 “(2) That by voluntarily acquiring from E. W. Cruse the water system which had been supplying water in the area where plaintiffs reside outside the city limits, defendants assumed that operator’s obligations with respect to non-resident water customers in this area ;
 

 “(3) That a public utility may without being guilty of unlawful discrimination classify its customers on any reasonable basis and make separate' rates for each class, but that such utility, whether privately or municipally operated, may charge but one rate for a particular service and any discrimination between customers as to the rate charged for the same service under like circumstance is improper;
 

 “(4) That a public utility, whether privately or municipally operated, has no right to condition its service or its rates upon collateral matters not connected with the furnishing of the particular service involved ;
 

 “(5) That the proposed imposition by defendants of a water rate which penalizes users of water for not purchasing electricity from defendants constitutes coercion and an attempt on the part of defendants to compel plaintiffs to purchase something which they may not want or need; and sets up an attempted classification for rate purposes which is capricious, arbitrary, oppressive and discriminatory;
 

 “(6) That as a consequence, the proposed rate here in contest if permitted to stand, would constitute unlawful and confiscatory discrimination, the taking of plaintiffs’ property without due process of law, and the denial to plaintiffs of the equal protection of the laws, guaranteed them by the Constitutions of both the State of Louisiana and the United States.
 

 “And, it appears most appropriate to state that the record contains not one scintilla of evidence in the stipulation of fact, or otherwise, tending to warrant or justify the .rate classification relied upon by defendants or the rates imposed pur
 
 *899
 
 suant thereto. No valid reasons are assigned in justification of either classification or rates. The record reflects the position of the defendants to be that, in the course pursued, they were within their legal rights, regardless of the consequences to the consumers and users of their public utility, service.
 

 “Counsel for plaintiffs and defendants are commended for their very able, thorough and exhaustive briefs and arguments presented on the submission of this case. These have been of inestimable value to the court.
 

 - “Accordingly, the judgment appealed must be reversed and judgment entered in favor of plaintiffs, decreeing the nullity of the rate here under attack and permanently enjoining its enforcement. '
 

 “For the .reasons assigned, the-judgment ■appealed is annulled, avoided, reversed and set aside, and it is now .ordered that the exception of no. cause of action be and it is hereby overruled.
 

 “It is further ordered, adjudged and decreed that defendants’ classification of their water customers residing outside the corporate limits of the City of Monroe, Louisiana, particularly plaintiffs-herein, on the basis of their purchase and use, or their failure to purchase and use, electric power and current from defendants, is unreasonable, and arbitrary and, as such, constitutes an unlawful and confiscatory discrimination and that, accordingly, rates adopted pursuant to such unlawful classification,. and particularly those as set forth in defendants’ Schedule C-l, be and they are likewise decreed unreasonable and arbitrary and, as such, unlawful and constitute an unlawful and confiscatory discrimination, aind, therefore, null and void.
 

 “It is further ordered, adjudged and decreed that an injunction be and it is hereby ordered issued herein as prayed for, and, accordingly, the defendants, the City of Monroe and the City of Monroe Utilities Commission, their officers, agents, servants and employees, be and they are hereby re: strained, prohibited and enjoined from hereafter collecting or attempting to collect the aforesaid unlawful rates as contained in defendants’ Schedule C-l, or any other rates based upon the aforesaid unlawful classification.”
 

 For the reasons assigned the judgment of ■the court of appeal is affirmed. All legal costs
 
 to
 
 be paid by the defendants-relators.